WILL OF GROSSE: GEVERS and husband, Appellants, vs. SCHWARZ and others, Respondents.

*May 11—June 20, 1932.*

*A. G. Boedecker,* attorney, and *Ernst von Briesen* of counsel, both of Milwaukee, for the appellants.

For the respondents there was a brief by *Wengert & Moeller,* attorneys, and *Alfred H. Handrich* of counsel, all of Milwaukee, and oral argument by *Eugene Wengert.*

WICKHEM, J.   On August 9, 1926, testatrix executed her last will and testament, and after a bequest of $500 to the children of Albert Gevers, and $500 to Mr. and Mrs. Reitter, provided that the balance should be distributed to four children of a brother, all of whom resided in Germany.

On May 11, 1931, testatrix executed a codicil, which was denied probate by the order appealed from.   By the terms of the codicil she gave her homestead, with contents, to Frieda Gevers and Albert Gevers "for the good care I received at their hands in my declining years."   The will was admitted without objection, but objections to the codicil were filed on behalf of the beneficiaries in Germany, upon the ground of mental incompetency and undue influence.

At the time of executing the codicil Martha Grosse was seventy-four years old.   She had no relatives in America. She was a widow and the owner of a flat building in Milwaukee.   She lived downstairs.   In 1928, when the upper flat became vacant, she leased it to Mr. and Mrs. Gevers. The Gevers testified that at that time they had been intimate friends of Mrs. Grosse for some years, and that Mrs. Grosse induced them to move into her flat upon the promise that the

flat would be theirs upon her death. It was the testimony of the Gevers that both of them had, without remuneration, performed numerous services for Mrs. Grosse before moving to the flat, and that these services continued after they moved there. Mr. Gevers took care of the repairs about the flat, and Mrs. Gevers assisted testatrix in housecleaning. During the last six months of her life testatrix required a great deal of care, and Mrs. Gevers generally stayed with her at night. During the last seven years of her life testatrix had living with her a Mrs. Gohler, who helped about the house and received her room and board for these services. Mrs. Gohler had most of the responsibility of caring for Mrs. Grosse, except at night when Mrs. Gevers was present. Mrs. Grosse died June 4, 1931. The codicil was executed on May 11, 1931. On the Saturday preceding the date of the proposed codicil Mrs. Gevers reminded Mrs. Grosse of her promise to leave her the flat, and asked her whether she had made a will. Mrs. Grosse responded, "If I didn't, I will do it on my dying bed." Thereupon Mrs. Gevers called Mr. Elsner, an attorney at law, and made arrangements with him to come to the house at two o'clock on May 11th, at which time Mrs. Gohler intended to be away and in fact was away from the house. Mr. Elsner came to the house at Mrs. Gevers' call, drafted the codicil as the testatrix dictated it to him, and then called to Mrs. Gevers, who occupied the upper flat, to get the witnesses. Mrs. Gevers called two witnesses, Mrs. Mary Stroebel and her daughter-in-law, Mrs. Walter Stroebel, and they came over and witnessed the document. Mr. Elsner testified that Mrs. Grosse talked rationally and stated that the codicil represented her will; that the two witnesses signed, and all three immediately left Mrs. Grosse's home. Before Mr. Elsner talked to the testatrix he asked Mrs. Gevers to leave the room, and on that occasion she addressed herself to the testatrix and said, "Now you promised me the house," or something to that effect. Mrs.

Gevers testified that she said, "I want just what you promised me."

The foregoing is a statement of the history of the case so far as the facts of execution are concerned. The trial court indicated in his opinion that he was fully satisfied that Martha. Grosse was not of sufficient mental capacity. The findings are very inartificially drawn. The only findings of fact that have any remote bearing upon mental capacity or undue influence are the fourth and fifth findings, as follows:

"4. That said deceased was also mentally affected, during said period, to such an extent that not infrequently she suffered from complete lapse of memory.

"5. That said Frieda Gevers was instrumental to have said codicil executed; and that she kept the execution of the same a secret until the death of said deceased."

As conclusions of law, however, the court finds that testatrix was mentally incapacitated to make the codicil, and that the same was procured by undue influence on the part of Frieda Gevers. While the findings are unsatisfactory, that furnishes no ground for disturbing the order, if the evidence sustains the conclusions of mental incapacity and undue influence. *Disch v. Timm,* 101 Wis. 179, 77 N. W. 196; *Wilkinson v. Wilkinson,* 59 Wis. 557, 18 N. W. 527; *White v. Magann,* 65 Wis. 86, 26 N. W. 260; *Jones v. Jones,* 71 Wis. 513, 38 N. W. 88; *Dietz v. Neenah,* 91 Wis. 422, 64 N. W. 299, 65 N. W. 500; *Williamson v. Neeves,* 94 Wis. 656, 69 N. W. 806.

The question arises, then, whether the court was justified in finding that testatrix was mentally incompetent, and that the codicil was procured by undue influence. It is well established that, in order to set aside a will upon either ground, the proof must be clear, convincing, and satisfactory. *Will of Fortner,* 188 Wis. 594, 206 N. W. 969; *Will of Emerson,* 183 Wis. 437, 198 N. W. 441; *Will of Lotwin,* 186 Wis. 42, 202 N. W. 151; *Will of Boardman,* 178 Wis. 517, 190

N. W. 355; *Ball v. Boston,* 153 Wis. 27, 141 N. W. 8. It is our conclusion that the proof offered by contestants does not meet the requirements of these cases.

Upon the issue of undue influence it was essential for contestants to establish by clear, convincing, and satisfactory evidence that there was opportunity to exercise undue influence; that there was a disposition upon the part of Mrs. Gevers to exercise it; that there was a susceptibility on the part of the testatrix to undue influence; and, finally, that there was a result indicating that undue influence had been exercised. *Will of Lotwin, supra.*

That there was opportunity for Mrs. Gevers to exercise undue influence may well be conceded. She lived in the same flat building with testatrix, was on very intimate terms with her, and stayed with her nights during the last six months of testatrix's life. We think, however, that there was no clear, convincing, and satisfactory evidence of disposition on the part of Mrs. Gevers to exercise undue influence, or that such influence was exercised. It is true that Mrs. Gevers reminded Mrs. Grosse of her promise to make a will; that she called Mr. Elsner, procured the witnesses, and on the occasion of the execution of the codicil reminded the testatrix before leaving the room that she had promised her the flat. This may lead to the inference that the conduct of Mrs. Gevers was to some extent influential in causing testatrix to make the will when she did, but it falls short of a clear showing of undue influence. Undue influence has been defined as a species of fraud. *Will of Emerson, supra.* It must not be confused with mere influence. *Will of Schaefer,* 207 Wis. 404, 241 N. W. 382. Nor can it be "presumed from conjecture or suspicion without reasonable and satisfactory proof of facts establishing the contrivance and undue influence." *Will of Wallace,* 197 Wis. 323, 222 N. W. 255. If the facts heretofore recited do not of themselves furnish clear and satisfactory evidence of undue influence,

we think they are not at all aided in this direction by a consideration of all the circumstances surrounding the relations of Mrs. Gevers and testatrix. It is conceded that the Gevers had for years been on intimate and friendly terms with Mrs. Grosse, and that during the last seven years of testatrix's life they had performed gratuitously numerous kindly services for Mrs. Grosse. It is not controverted that some three years before the death of testatrix the Gevers moved into the upper flat. It is the testimony of the Gevers that they moved upon the promise that the flat building would be left to them at the death of testatrix. It may be suggested that this promise rests upon the unsupported testimony of interested witnesses, and that the Gevers appear to have occupied the ordinary relation of tenants to Mrs. Grosse. However, the testimony as to the relations between the Gevers and Mrs. Grosse is in several respects corroborated. The original will made prior to the time when the Gevers moved, contained a bequest for the children of the Gevers. While Mrs. Gevers was not a blood relative, she was related to Mrs. Grosse's deceased husband. The fact that the Gevers performed without compensation numerous services—Mrs. Gevers in housecleaning, nursing, etc., and Mr. Gevers in repairs about the house—is fully established. All these circumstances indicate that there was something in the situation quite different from the ordinary relation of tenant and landlord. The testatrix's statement to Mr. Elsner that the disposition of the codicil had to do with rewarding those who took care of her is also quite significant. Under these circumstances the fact that Mrs. Gevers reminded Mrs. Grosse of her promise, and that she asked Mr. Elsner to come to the house, and procured the witnesses, seems to us to lose whatever significance it might be argued to have, standing alone, as evidence of undue influence. Outside of this reminder, and the fact that Mr. Elsner came at the solicitation of Mrs. Gevers, and that she obtained the witnesses,

there is no basis for a conclusion that any influence at all was exercised upon Mrs. Grosse. There is nothing in the testimony of Mrs. Gohler, who lived with Mrs. Grosse, to indicate a single act on the part of the Gevers which was open to suspicion; nor is there any evidence, aside from the mere fact of age, that leads to the conclusion that the testatrix was susceptible to undue influence. The codicil cannot be said to have accomplished such an unnatural disposition of the property as to indicate that undue influence had been exercised. While the Gevers were not blood relatives, they were related to her through marriage, and, as heretofore indicated, had without compensation given their services freely to her in her declining years. Mrs. Grosse had no blood relatives in this country, and none with whom her relations were particularly intimate.

It is our conclusion that the evidence does not sustain a finding that the codicil was procured by undue influence.

We have reached the same conclusion with respect to the claim of mental incompetency. The test of mental capacity, as laid down in *Butler's Will,* 110 Wis. 70, 85 N. W. 678, is as follows:

"The test is not whether the testator did the best or the wisest or the theoretically just thing in his will; but, Did he have sufficient active memory to collect in his mind and comprehend, without prompting, the condition of his property, his relations to his children and other persons who might properly be his beneficiaries, and the scope and bearing of his will, and to hold these things in his mind a sufficient length of time to perceive their obvious relations to each other, and be able to form some rational judgment in relation to them?"

Having in mind the burden to show mental incompetency by clear, convincing, and satisfactory proof, we think that the testimony offered to show incompetency indicates that at times during the last year of her life Mrs. Grosse was forgetful, had difficulty in sustaining a conversation, would talk

about her husband and brother-in-law as though they were still alive, although they had been dead for some years, and that this condition was somewhat more aggravated during the last three months of her life. Most of this testimony was by witnesses who saw the testatrix only occasionally. The testimony of Mrs. Gohler, who testified for the contestants, was that sometimes she felt "all right" and other days she did not, but that when she was not feeling "all right" they were short spells. She always knew how much money she had in her purse. The testimony of Mr. Elsner, an attorney of high character, was to the effect that she was perfectly rational on the occasion of executing the codicil. She indicated to him without prompting her desires with respect to the codicil, and although Mr. Elsner testified that at times testatrix did suffer from what he designated as "aberrations of mind," he was convinced that at the time of execution she was competent to make the codicil. This testimony was strongly supported by that of the subscribing witnesses. It was recently said by this court in *Will of Schaefer, supra,* that the testimony of the attorney who drew the will and of the subscribing witnesses, that the deceased was competent and under no apparent undue influence, "may not be lightly brushed aside or permitted to be outweighed by circumstances which give rise merely to suspicions." In *Aggas v. Munnell,* 302 Pa. St. 78, 152 Atl. 840, 843, it was said:

"Neither old age nor its infirmities, including untidy habits, partial loss of memory, inability to recognize acquaintances, and incoherent speech, will deprive a person of the right to dispose of his own property."

We have, then, this situation: An aged woman, conceded by all who knew her to be subject to spells of forgetfulness and to occasional inability to recognize acquaintances, makes a will at a time when a reputable attorney and the witnesses

to the will positively testify that she was rational and competent. The testimony offered by the contestants, aside from that of Mrs. Gohler, is that of acquaintances who saw her at fairly infrequent intervals, and who testified only to circumstances that were conceded by everybody, including Mrs. Gevers. Mrs. Gevers, for example, testified that testatrix was forgetful at times and that she sometimes talked about things that had happened long ago as though they had happened only a short time ago. In other words, the occasional lapses due to the infirmities of old age are admitted by everybody who knew Mrs. Grosse. They do not, however, in the face of the testimony of the scrivener and witnesses that she was competent at the time of making the codicil, establish her incompetency at that time by clear, convincing, and satisfactory evidence.

There remains to be considered the expert testimony of Dr. Powers. Dr. Powers never saw the testatrix, and his opinion as to her competency is entirely based upon a hypothetical question. In this hypothetical question the age and the health of the testatrix were stated, together with the various items of evidence as to her lapses of memory, her failure to recognize friends, her frequent impressions that events that happened years ago had happened only recently. The doctor stated that these circumstances would be proof of the mental changes of old age, hardening of the arteries, decreasing mental vigor, and that these infirmities had progressed to a degree in the individual to justify a diagnosis of senile dementia. The doctor very carefully qualified this testimony, however, by stating that this disorder varies in degree. The hypothetical question omits the positive testimony of the scrivener and the witnesses that the testatrix appeared to be rational at the time of executing the codicil. The doctor's qualification of his testimony to the effect that the affliction of the testatrix would vary in degree, takes

from the testimony most of its usefulness. His whole testimony indicates that such a condition as he described is a progressive condition. If it is a progressive condition, there is some point in its progress when the testatrix would still be capable of making a valid will. The testimony falls short of a clear opinion that that point in the progress of the disease had been reached. A showing that testatrix had a slight taint of mental disorder is not enough to indicate lack of mental capacity.

It is our conclusion that the expert opinion in this case does not offer clear evidence of mental incapacity because the hypothetical question was incomplete, and because there is no satisfactory indication, assuming the testatrix to have been in some stage of senile dementia, that the progress of the disease had been so great as to destroy capacity, especially in view of the positive testimony of the scrivener and the witnesses that the testatrix was perfectly rational at the time.

For the foregoing reasons it follows that the judgment must be reversed.

*By the Court.*—Order and judgment reversed, with directions to admit the codicil to probate.